# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-1229

_____

Alvin Bernal Jackson,       *
      *
      Appellant,       *
      *    Appeal from the United States
      v.       *    District Court for the Eastern
      *    District of Arkansas.
Larry Norris, Director,       *
Arkansas Department of Correction,    *
      *
      Appellee.       *

_____

Submitted: February 10, 2010
Filed: August 11, 2010

_____

Before RILEY, Chief Judge,[1] SMITH and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

This is a petition for habeas corpus relief under 28 U.S.C. § 2254 brought by Alvin Jackson, an Arkansas prisoner facing execution. Jackson's petition, before us for the second time, asserts, as relevant here, that he is mentally retarded and, therefore, his execution would violate the Eighth Amendment under Atkins v. Virginia, 536 U.S. 304 (2002) (the "Atkins claim"). In his first appeal, we reversed the district court's dismissal of the Atkins claim on the basis of procedural default.

_____

[1]The Honorable William Jay Riley became Chief Judge of the United States Court of Appeals for the Eighth Circuit on April 1, 2010.

See Jackson v. Norris (Jackson I), 256 F. App'x 12 (8th Cir. 2007) (unpublished per curiam), cert. denied, 128 S. Ct. 2907 (2008).  On remand, the district court granted summary judgment to Norris, dismissing the Atkins claim on the merits, without an evidentiary hearing (an "Atkins hearing").  Jackson appeals.  Because Jackson has made the requisite showing for an Atkins hearing, we reverse the district court's denial of such a hearing, vacate the district court's grant of summary judgment to Norris on the Atkins claim, and remand to the district court for an Atkins hearing.

I.

Jackson has been sentenced to death for the capital murder of Arkansas Department of Correction's prison guard, Scott Grimes, while serving a life sentence for the capital murder of Charles Colclasure, see Jackson v. State, 811 S.W.2d 299 (Ark. 1991).  His conviction and sentence were affirmed by the Arkansas Supreme Court, Jackson v. State, 954 S.W.2d 894 (Ark. 1997); and his request for state postconviction relief was denied, Jackson v. State, 105 S.W.3d 352 (Ark. 2003).

On October 27, 2003, Jackson filed his habeas petition, raising the Atkins claim[2] and asserting that:

> Jackson is retarded as that concept is defined in Atkins:  Subaverage intellectual functioning and also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18.  The facts and diagnoses delineated in [Jackson's ineffective assistance claim] demonstrate that Jackson has both the

[2]Jackson alleged six other grounds for habeas relief.  Each of the claims had been raised in state court, and the district court granted summary judgment to Norris on all of the claims because Jackson had failed to meet the standard for habeas relief.  See 28 U.S.C § 2254(d).  The district court and this court denied Jackson a certificate of appealability on these claims.

functioning and adaptive problems required for the finding, as well as it being clear that this was established before age 18.

(Pet. 32 (quotation omitted).) Norris filed a motion for summary judgment, contending, as relevant here, that the Atkins claim failed because it was (1) procedurally defaulted as Jackson did not invoke Arkansas Code Annotated § 5-4-618(d), which provides a procedure by which a defendant can show that he is mentally retarded and avoid the death penalty, and (2) without merit. On January 4, 2007, the district court dismissed the Atkins claim as procedurally defaulted because Jackson had not presented a mental retardation defense to the death penalty available to him under Arkansas law. See Ark. Code Ann. § 5-4-618 (precluding the execution of the mentally retarded). The court denied Jackson's motion for a certificate of appealability.

We granted Jackson a certificate of appealability solely on the Atkins claim and, in Jackson I, reversed the district court's dismissal of the claim in light of Simpson v. Norris, 490 F.3d 1029 (8th Cir. 2007), cert. denied, 552 U.S. 1224 (2008),[3] and remanded the matter to the district court for "further proceedings." Jackson I, 256 F. App'x at 12. On remand, the district court issued an order directing Jackson to respond to Norris's pre-appeal summary judgment motion on the merits of the Atkins claim. Jackson filed a response and a motion for discovery and funds to retain experts.

On January 6, 2009, the district court granted summary judgment to Norris, dismissing the Atkins claim on the merits. The court correctly observed that there is no uniform federal standard for mental retardation, see Sasser v. Norris, 553 F.3d

---

[3]In Simpson v. Norris, 490 F.3d 1029 (8th Cir. 2007), cert. denied, 552 U.S. 1224 (2008), we concluded that failing to bring a claim under Arkansas Code Annotated § 5-4-618 did not prevent a habeas petitioner from bringing an Atkins claim. Simpson, 490 F.3d at 1034-36.

1121, 1125 n.3 (8th Cir.), cert. denied, 130 S. Ct. 397 (2009) ("Atkins actually does not define mental retardation, leaving the development of the new constitutional restriction to the states." (citing Atkins, 536 U.S. at 317)), and purported to apply Arkansas's definition of mental retardation, see Ark. Code Ann. § 5-4-618(a)(1).

The Arkansas standard for mental retardation has three prongs: (1) "[s]ignificantly subaverage general intellectual functioning . . . manifest[ing] . . . no later than . . . eighteen (18) years of age," (2) "a significant deficit or impairment in adaptive functioning manifest[ing] . . . no later than age eighteen (18) years of age[,]" and (3) "[a] deficit in adaptive behavior." Id. § 5-4-618(a)(1). The defendant bears the burden of proving each prong by a preponderance of the evidence. Id. § 5-4-618(c). The district court determined that Jackson had arguably presented allegations sufficient to create a fact question as to the first prong. However, the court concluded that Jackson had failed to show a fact question on the second prong. The court did not mention or address the third prong.

In addressing the second prong, the court correctly defined adaptive functioning according to the Diagnostic and Statistical Manual of Mental Disorders (4th ed. text revision 2000) (hereinafter "DSM-IV-TR").[4] "*Adaptive functioning* refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." DSM-IV-TR at 42. The second prong is met if an individual has "significant limitations in at least two of the

---

[4]The Supreme Court has acknowledged the two generally accepted clinical definitions for mental retardation set forth by the American Psychiatric Association (APA) and the American Association on Mental Retardation. Atkins v. Virginia, 536 U.S. 304, 308 n.3 (2002). The Court noted, "The statutory definitions of mental retardation are not identical, but generally conform to the[se] clinical definitions . . . ." Id. at 317 n.22. The current version of the APA model is contained in the Diagnostic and Statistical Manual of Mental Disorders (4th ed. text revision 2000).

following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." Id. at 41. The district court determined that Jackson's allegations only demonstrated a significant impairment in one skill area—functional academic skills. The court further observed that Jackson could drive, maintained a neat appearance, took the necessary steps to effect a legal name change, and made use of available resources (such as administrative grievance procedures and federal laws) to seek relief when he believes his rights have been violated. The court further noted that the transcript of Jackson's custodial interview relating to the 1989 Colclasure murder as well as his deposition testimony in his 42 U.S.C. § 1983 litigation established that he was not mentally retarded within the meaning of Atkins.

The district court determined that an Atkins hearing was not warranted, concluding that, even if Jackson's factual allegations were true, he had failed to demonstrate that he was entitled to habeas relief. In addition, the court denied Jackson's motion for discovery and funds for investigation and testing, determining that further evidentiary development was unnecessary because, in light of the undisputed record, additional testing and investigation would not enable Jackson to prevail. The district court granted Jackson's motion for a certificate of appealability.

II.

In this appeal, Jackson argues that the district court erred by denying him an Atkins hearing because: (1) under Sasser, he is entitled to such a hearing as a matter of law, and (2) even if he is not entitled to an Atkins hearing as a matter of law, he has made the requisite showing for such a hearing. Alternatively, Jackson contends that, even if he was not entitled to an Atkins hearing, the district court erred in granting summary judgment to Norris on the Atkins claim because he had presented sufficient evidence to generate a genuine issue of fact as to whether he is mentally retarded within the meaning of Atkins.

We first address whether Jackson was entitled to an Atkins hearing. Where, as here, an Atkins hearing is not barred by 28 U.S.C. § 2254(e)(2),[5] we review a district court's denial of an Atkins hearing for abuse of discretion. See Johnston v. Luebbers, 288 F.3d 1048, 1059 (8th Cir. 2002). A district court does not abuse its discretion where "such a hearing would not assist in the resolution of [the Atkins] claim." Id. (quotation omitted).

Jackson asserts that he is entitled to an Atkins hearing, as a matter of law, under Sasser. Because Sasser relies heavily on our decision in Simpson, we begin our analysis with Simpson. In Simpson, the petitioner, "a prisoner under sentence of death in the State of Arkansas," sought habeas relief on "an eighth amendment claim under Atkins that his mental retardation made him ineligible for the death penalty." 490 F.3d at 1031, 1034. After reversing the district court's decision that Simpson had procedurally defaulted his Atkins claim, we remanded the matter for an Atkins hearing, explaining:

> "Where the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court." Townsend v. Sain, 372 U.S. 293, 312 (1963), overruled on other grounds, Keeney v. Tamayo-Reyes, 504 U.S. 1, 5-6 (1992). Mr. Simpson has alleged that he is mentally retarded as Atkins defines that condition, which would entitle him to relief, and that matter remains in dispute. Since his inability to

---

[5]Generally, section 2254(e)(2) bars an evidentiary hearing unless a habeas petitioner "has failed to develop the factual basis of a claim in State court proceedings." 28 U.S.C. § 2254(e)(2). Section 2254(e)(2)'s proscription does not apply here because "Atkins created a previously unavailable claim based on the unconstitutionality of executing the mentally retarded, [Jackson] can hardly be said to have lacked diligence in developing the factual basis of that claim in state court[,]" Simpson, 409 F.3d at 1035. Atkins was decided June 20, 2002, after the Arkansas Supreme Court had affirmed Jackson's conviction and sentence, see Jackson v. State, 954 S.W.2d 894 (Ark. 1997), and while his appeal from the trial court's denial of post-conviction relief was pending, see Jackson v. State, 105 S.W.3d 352 (Ark. 2003).

present his <u>Atkins</u> claim in state court precluded him from receiving "a full and fair evidentiary hearing" there, he satisfies the conditions outlined in <u>Townsend</u>.

<u>Simpson</u>, 490 F.3d at 1035. However, <u>Simpson</u> did not specify the allegations of mental retardation that had been raised by the petitioner.

In <u>Sasser</u>, the petitioner, "an Arkansas state prisoner sentenced to death" asserted that "he [was] mentally retarded and ineligible for the death penalty" under <u>Atkins</u>. <u>Sasser</u>, 553 F.3d at 1123. The district court determined that the <u>Atkins</u> claim was procedurally defaulted "because Sasser did not raise the issue in state court" and that "Sasser did not satisfy the 'actual innocence' exception to procedural default because he failed to present sufficient evidence of his mental retardation."[6] <u>Id.</u> at 1124. The petitioner appealed, contending that <u>Simpson</u> "require[d] the district court [to] hold an evidentiary hearing on the merits of [Sasser's] mental retardation claim." <u>Sasser</u>, 553 F.3d at 1124-25.

In <u>Sasser</u>, we noted that "<u>Simpson</u> may not mandate an evidentiary hearing in every conceivable set of circumstances," expressly reserving the question that Jackson claims <u>Sasser</u> answers. <u>Sasser</u>, 553 F.3d at 1126. However, we determined that the district court's denial of an <u>Atkins</u> hearing was "contrary to <u>Simpson</u>," as <u>Simpson</u> provided that an <u>Atkins</u> hearing was warranted where a petitioner "'alleged that he [was] mentally retarded as <u>Atkins</u> defines that condition.'" <u>Sasser</u>, 553 F.3d at 1125 (quoting <u>Simpson</u>, 490 F.3d at 1035). The <u>Sasser</u> Court then identified the allegations in Sasser's habeas petition that required the district court to conduct an <u>Atkins</u> hearing:

---

[6]"A petitioner is 'actually innocent' of the death penalty where he is ineligible for the death penalty." <u>Sasser v. Norris</u>, 553 F.3d 1121, 1126 (8th Cir. 2009) (citing <u>Sawyer v. Whitley</u>, 505 U.S. 333, 345 (1992)).

(1) [Sasser] meets the diagnostic criteria for mental retardation promulgated by the American Association on Mental Retardation and the American Psychiatric Association; (2) his IQ is 79 (which Sasser asserts places him in the mentally retarded range, taking into account the margin of error); (3) he was incapable of graduating from high school despite being enrolled in school for twelve years; (4) he was never able to live independently and was 29 at the time of [the] murder [for which he received the death penalty] and still living with his mother . . . ; (5) he was incapable of paying bills or maintaining a checking account; (6) he was capable of only the simplest, manual-labor jobs; and (7) he manifests significant deficits in intellectual and adaptive functioning.

Sasser, 553 F.3d at 1125-26.  The court further explained that

there [was] no question the allegations in Sasser's petition are as adequate as Simpson's pleading threshold where the petitioner "alleged that he is mentally retarded as Atkins defines that condition" in order to obtain an evidentiary hearing on his mental retardation claim.  Nothing in Sasser's case precludes the need for an Atkins evidentiary hearing.

Sasser, 553 F.3d at 1126 (quoting Simpson, 490 F.3d at 1035).

The Sasser Court also rejected the government's attempt to distinguish Simpson on the basis that the district court had afforded Sasser a "remand procedure," unlike the district court in Simpson, providing Sasser with the opportunity to present additional evidence regarding his mental retardation.  Sasser, 553 F.3d at 1126-27.  The court concluded,

Sasser was not obligated to expand the record with additional evidence showing he was entitled to a hearing, nor was he obligated to file another motion requesting a hearing—Sasser already requested a hearing in his [petition].  Simpson explains Sasser [was] entitled to a hearing simply by virtue of "alleg[ing] that he [was] mentally retarded as Atkins defines that condition."  Given the circumstances and factual allegations in

-8-

Sasser's case, <u>Simpson</u> expressly requires an <u>Atkins</u> evidentiary hearing, not some other type of "remand procedure" crafted by the district court. We therefore reverse and remand to the district court for an evidentiary hearing to adjudicate the merits of Sasser's mental retardation claim.

<u>Sasser</u>, 553 F.3d at 1126-27 (<u>quoting</u> <u>Simpson</u>, 490 F.3d at 1035).

We conclude that Jackson's petition has satisfied the pleading standard of <u>Simpson</u> and <u>Sasser</u>, by expressly incorporating the following evidence from the trial record for the Colclasure murder. (Pet. at 14-15, 32.)

(1)    Dr. Patricia Kohler, the director of the Division of Special Education of the Little Rock School District, testified that "at almost seven years of age Jackson was referred for analysis because of poor schoolwork, emotional outcries, and disruptive behavior. He was tested at the borderline range of mental ability." (<u>Id.</u> at 16.)

(2)    Jackson's 1978 evaluation by the Elizabeth Mitchell Children's Center concluded that he "was unable to function physically or emotionally in a classroom setting at the present time. His verbal IQ was 60, his performance IQ was 90, rendering his full scale IQ as 70. The thirty point discrepancy indicated some organicity as well as the severeness of his learning problems." (<u>Id.</u> (quotation omitted).)

(3)    When Jackson was eight years old, his school principal wrote his mother a note, stating:

It will be necessary for you to keep Alvin out of school until something is worked out about his further education. It is almost impossible to get him into or keep him in a classroom. He wanders over the building upsetting furniture, yelling into other classrooms, and hitting or kicking anyone who is within reach. Yesterday he kicked a supervising aide bruising her leg. Today he has choked two children and kicked or hit a

number of others. Last week he announced that he was going to walk home and dashed out of the building. He did not leave, but there is no assurance that he will not leave the next time.

(Id. (quotation omitted).)

(4)  At age 11, Jackson had "a mental age of seven years eight months, an IQ of 70[,] and classifi[ed] [as a] very slow learner [with] poor receptive language development. A 23 point discrepancy at that time between his verbal and performance scores rendered the full scale score irrelevant. He was deemed to have mental retardation." (Id. at 16-17.)

(5)  At age 12, Jackson was "placed on Ritalin; the medication was found to be helpful but the dosage level was apparently insufficient to control his hyperactivity. His academic skills were at the second and third grade levels. In December of that year he was placed in a home schooling program." (Id. at 17.)

(6)  At age 15, Jackson had "some difficulty in the visual motor area and expressive and receptive language skills" and that concerns with regard to his behavior were "significant." (Id. (quotation omitted).)

(7)  Dr. Lee Archer, a neurologist at the University of Arkansas for Medical Sciences, testified that he had examined Jackson and concluded that he had attention deficit hyperactivity disorder (ADHD) and an antisocial personality disorder. "Dr. Archer observed that attention deficit hyperactivity disorder is thought to predispose people to antisocial personality." (Id.) Dr. Archer determined that Jackson abused alcohol and drugs and had "borderline intellectual functioning." (Id.)

(8)  Dr. Sam Clemens, a child and adolescent psychiatrist at the University of Arkansas, testified about the characteristics of ADHD. Dr. Clemens

testified that [ADHD] is a mental disorder that first begins in childhood and can continue through a lifetime, that the more severe forms influence almost everything a person does, that some persons afflicted with it exhibit antisocial behavior as they mature, and that if they have borderline mental retardation it makes their lives more difficult. He testified that the researchers in the field felt that it is some kind of organic condition or brain dysfunction that the person simply cannot help.

(Id. at 17-18.)

(9)    Jackson's older brother testified that Jackson (1) "had a difficult time growing up, having been picked on a lot," and (2) "witnessed a number of confrontations between [his] mother and . . . stepfather[.]" (Id. at 18.)

Under the first prong of Arkansas's definition of mental retardation, Jackson must show that, before age 18, he had "[s]ignificantly subaverage general intellectual functioning." Ark. Code Ann. § 5-4-618(a)(1)(A). "Significantly subaverage intellectual functioning is defined as an IQ of about 70 or below . . . ." DSM-IV-TR at 41. "There is a rebuttable presumption of mental retardation when a defendant has an intelligence quotient of sixty-five (65) or below." Ark. Code Ann. § 5-4-618(a)(2). Per Jackson's habeas petition, the results of two IQ tests administered before his 18th birthday indicated an IQ of 70.[7] Therefore, there is a genuine issue of fact as to the first prong.

Next, Jackson must allege "a significant deficit or impairment in adaptive functioning manifest[ing] . . . no later than age [18]." Ark. Code Ann. § 5-4-

---

[7]We note that an IQ score may involve "a measurement error of approximately 5 points," depending on the testing instrument. DSM-IV-TR at 41. "Thus, it is possible to diagnose Mental Retardation in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior." Id. at 41-42.

618(a)(1)(A). We have already noted that the district court properly defined this term and the requisite showing a petitioner must make in order to show a significant deficit or impairment in adaptive functioning. However, we disagree with the district court's conclusion that Jackson did not allege limitations in two skill areas as required. See DSM-IV-TR at 41. Rather, we conclude that Jackson has offered evidence of significant limitations in two skill areas prior to age 18, specifically, social/interpersonal skills and functional academic skills. See id.

First, with regard to social/interpersonal skills, Jackson has alleged a significant impairment in that: (1) at age 7, he was referred to Elizabeth Mitchell Children's Center for evaluation and was deemed "unable to function physically or emotionally in a classroom setting at the present time," (Pet. 16); (2) at age 8, he was expelled from school indefinitely because he was, essentially, uncontrollable in the school environment, including being violent toward other children and adults; (3) at age 15, he had "significant" behavioral issues, (id. at 17); and (4) his diagnoses of antisocial personality disorder and ADHD. Second, in terms of functional academic skills, Jackson has alleged a significant impairment in that: (1) at almost age 7, he was referred for analysis because of poor schoolwork, emotional outcries, and disruptive behavior; (2) at age 11, he was again tested and received a mental age of seven years eight months, and classification of very slow learner or poor receptive language development; and (3) at age 12, his academic skills were at the second and third grade levels. Therefore, there is a genuine issue of fact as to the second prong.

Finally, the third prong, which the district court did not address, requires a showing of "[a] deficit in adaptive behavior" with no age requirement. Ark. Code. Ann. § 5-4-618(a)(1)(B). The third prong does not appear in the DSM-IV-TR's criteria for mental retardation, see DSM-IV-TR at 41; however, the DSM-IV-TR does use the term "adaptive behavior" interchangeably with the term "adaptive functioning," see id. at 42 ("Several scales have . . . been designed to measure adaptive functioning or behavior."). Similarly, the definition of mental retardation in

-12-

a number of states does not contain a requirement equivalent to Arkansas's third prong. See Ala. Code § 15-24-2(3); Cal. Penal Code § 1376(a); Conn. Gen. Stat. § 1-1g; Fla. Stat. § 921.137(1); Ky. Rev. Stat. § 532.130(2); Neb. Stat. § 28-105.01(3); Tenn. Code Ann. § 39-13-203; Tex. Health & Safety Code § 591.003(13).

Arkansas case law does not shed much light on what the third prong encompasses. In Miller v. State, No. CR 08-1297, 2010 Ark. 1 (2010), the only case to address the term in any significant way, the Arkansas Supreme Court first addresses the second prong—the defendant's adaptive functioning:

> We continue our review with the evidence presented from the experts as to Miller's adaptive functioning. Dr. Deyoub observed that Miller had held a steady job for fourteen years, had been married, and had two children of his own; he opined that this level of adaptive functioning was not consistent with an intelligence quotient of 59. Dr. Price, however, observed that while on the job Miller was supervised and protected by various family members, including Miller's grandfather and uncle, and that he was disciplined on the job numerous times. Dr. Price also pointed out that Miller's marriage had ended in divorce and that he had permanently lost custody of his children. Dr. Mallory commented that Miller's behavior on the job was a concern to other employees and that Miller had been fired for sexual harassment. However, Dr. Mallory also commented on Miller's behavior while incarcerated, noting that he kept up with financial transactions, wrote letters, and held telephone conversations. Dr. Johnson did not express any opinion as to Miller's adaptive behavior, although he did opine that Miller could not separate reality from fantasy and diagnosed Miller with paranoid schizophrenia.

Miller, No. CR 08-1297, slip op. at 18-19. The court then addressed the third prong—the defendant's adaptive behavior:

> With respect to his adaptive-behavior problems, [Miller's mother] testified that her son was extremely withdrawn in school, did not make friends easily, and could not connect with other people. She stated that

from about age twelve to fourteen years, Miller went through periods where he dressed and acted like various characters such as a professional basketball player and a bull rider. She also testified that Miller was unable to keep a checkbook.

Id. at 19-20.

Although Miller does not expressly address the definition of the term "adaptive behavior," its discussion of the defendant's adaptive behavior problems indicates that the term encompasses the same skill areas as adaptive functioning, see DSM-IV-TR at 41, but that there is no age requirement on the evidence used to establish limitations in adaptive behavior, see Ark. Code. Ann. § 5-4-618(a)(1)(B). Thus, we conclude that the same evidence that satisfied Jackson's burden of demonstrating a fact issue on the second prong also does so with respect to third prong.

In sum, the allegations contained in Jackson's habeas petition mandate an Atkins hearing under Simpson and Sasser. Accordingly, we vacate the district court's grant of summary judgment to Norris on the Atkins claim and remand to the district court for an Atkins hearing.

### III.

For the reasons stated above, we reverse the district court's determination that Jackson was not entitled to an Atkins hearing, vacate the district court's grant of summary judgment to Norris on the Atkins claim, and remand to the district court for an Atkins hearing.

_____