REINHARDT, Circuit Judge,
specially concurring:
Obviously, I concur entirely in the majority opinion. I write this special concurrence only because I feel compelled to convey my serious concerns regarding the constitutionality of Arizona’s Atkins statute. The issue before us is not limited to the case of Robert Smith. Rather, the constitutional infirmity of Arizona’s statute creates a recurring problem with potentially far-reaching consequences: Arizona has executed 15 inmates since Atkins,[1] and 124 inmates remain on its death row, the eighth highest number of any state.[2] As *1203 detailed below, if presented with the issue, I would likely hold that in light of Hall v. Florida, — U.S.—, 134 S.Ct. 1986, 188 L.Ed.2d 1007 (2014), both substantive prongs of Arizona’s intellectual disability statute — governing “intellectual functioning” and “adaptive behavior” — violate the Eighth Amendment because they permit the execution of individuals whom Atkins deems categorically ineligible for capital punishment.[3]
In Atkins, the Supreme Court cited the clinical definition for intellectual disability, but did not make clear that this definition was binding on the states. In Hall, however, the Court held that states must comply with elements of the clinical definition about which there exists a national consensus. Because both of Arizona’s substantive prongs are more restrictive than the clinical definition, and because a national consensus exists with regard to the pertinent elements of the clinical definition, Arizona’s statute is in all likelihood unconstitutional.
A. The Supreme Court Embraces the Clinical Definition of Intellectual Disability
In Atkins v. Virginia, 536 U.S. 304, 314-16, 122 S.Ct. 2242, 153 L.Ed.2d 335, (2002), the Supreme Court identified a “national consensus” against executing the intellectually disabled, gleaned from its survey of states passing legislation exempting the intellectually disabled from the death penalty and the consistency of the direction of such legislative change. The Court defined “mental retardation” by citing two clinical definitions, one from the ninth edition of the American Association on Mental Retardation’s (AAMR) Mental Retardation: Definition, Classifications, and Sys-terns of Support (9th ed.1992) [hereinafter AAMR 9th ed.], and a second from the fourth edition of the American Psychiatric Association’s (APA) Diagnostic and Statistical Manual of Mental Disorders (4th ed.2000) [hereinafter DSM-IV]. Id. at 309 n. 3, 122 S.Ct. 2242. The AAMR defines intellectual disability as characterized by two clinical elements: (1) “significantly subaverage intellectual functioning,” (2) “existing concurrently with related limitations in ... adaptive skill areas,” which must “manifest [themselves] before age 18.” AAMR 9th ed., supra, at 1. The DSM-IV similarly defines intellectual disability as consisting of (1) “significantly subaverage general intellectual functioning,” (2) “accompanied by significant limitations in adaptive functioning,” where “[t]he onset ... occurs[s] before age 18 years....” DSM-IV, supra, at 41. The Court noted that the states’ “statutory definitions of mental retardation are not identical, but generally conform to the clinical definitions” set forth by the AAMR and APA. Atkins, 536 US. at 317 n. 22, 122 S.Ct. 2242.
Atkins did not expressly state whether it was establishing a substantive definition of intellectual disability as a matter of federal law. The Court explained that “[t]o the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded.” Id. at 317, 122 S.Ct. 2242. Citing Ford v. Wainwright, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), the Court explained that it “le[ft] to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.” Atkins, 536 U.S. at *1204 317, 122 S.Ct. 2242 (quoting Ford, 477 U.S. at 405, 416-17,106 S.Ct. 2595) (first alteration added). Because the cited sections of Ford address only procedural issues, and say nothing regarding the substantive definition of insanity, a straightforward reading of the Court’s statement is that it leaves to the states the determination of procedural issues only. Stated differently, under this reading of Atkins, the Court did not leave to the states the task of defining intellectual disability, but merely the task of determining procedures capable of use in identifying intellectually disabled persons. Because a majority of the Court in Ford found Florida’s specific procedures for determining the sanity of a condemned prisoner inadequate “to achieve even the minimal degree of reliability required for the protection of any constitutional interest,” it is reasonable to conclude that a state’s discretion in even this area is similarly circumscribed. 477 U.S. at 413, 106 S.Ct. 2595; see also id. at 418, 106 S.Ct. 2595 (plurality opinion); id. at 424-25, 106 S.Ct. 2595 (Powell, J., concurring in part and concurring in the judgment); id. at 427, 106 S.Ct. 2595 (O’Connor, J., concurring in the result in part and dissenting in part).
Nevertheless, courts generally interpreted Atkins to mean that the Supreme Court did not establish a substantive definition of intellectual disability, and instead included the substantive definition of intellectual disability as among the tasks left to the states. See Moormann v. Schriro, 672 F.3d 644, 648 (9th Cir.2012) (“The Supreme Court in Atkins did not define mental retardation as a matter of federal law.”); Williams v. Cahill ex rel. Cnty. of Pima, 232 Ariz. 221, 303 P.3d 532, 543 (App.2013) (“[Ejvery other state court that has addressed the issue has determined or implied that Atkins allows the states to define mental retardation without strict adherence to the clinical standards. Of the thirty-three states that still permit use of the death penalty, courts in twenty-three have stated or implied that Atkins did not define mental retardation, but instead left that task to individual states.”).
In Hall v. Florida, — U.S. —, 134 S.Ct. 1986, 188 L.Ed.2d 1007 (2014), however, the Court held that, contrary to what the state courts and our own court had thought, Atkins set forth a substantive definition of intellectual disability encoih-passing those aspects of the clinical definition about which a national consensus exists. See id. at 1993 (“The question this case presents is how intellectual disability must be defined in order to implement these principles and the holding of Atkins.”); id. at 1999 (“The clinical definitions of intellectual disability ... were a fundamental premise oí Atkins.”); see also Van Tran v. Colson, 764 F.3d 594, 612 (6th Cir.2014) (“In Hall, the Court reasoned that the Constitution requires the courts and legislatures to follow clinical practices in defining intellectual disability.”). In Hall, the Court held unconstitutional Florida’s use of a strict IQ score cut-off of 70 without taking into account the test’s margin of error, known as a “standard error of measurement” or “SEM,” because this approach deviated from the clinical definition embraced in Atkins, and because a national consensus existed with regard to this aspect of the clinical definition. Hall, 134 S.Ct. at 2000; see id. at 1997-98 (finding a consensus against using a strict IQ score cut-off of 70 without considering the margin of error because such a practice is mandated by nine states at the most, and because all but one of the state legislatures to have considered the issue after Atkins and whose law has been interpreted by its courts have foregone use of a strict cut-off of 70).
The Court concluded that although Florida’s statute appeared facially consistent with Atkins, the Florida Supreme Court had interpreted the provision more nar *1205 rowly, rendering it inconsistent with Atkins and thus unconstitutional. Id. at 1994, 2000. Specifically, the Court stated that the Florida Supreme Court had held that an individual with an IQ score above 70 does not have an intellectual disability and is barred from presenting any other evidence to this effect, contrary to the medical community’s views that IQ scores are inherently imprecise and should be considered in light of their margin of error. Id. at 1994-95. The Court explained that “IQ test scores should be read not as a single fixed number but as a range” taking into account the test’s inherent imprecision, and that “an individual’s score is best understood as a range of scores on either side of the recorded score.” Id. at 1995. The Court thus held that “when a defendant’s IQ test score falls within the test’s acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits.” Id. at 2001.
1. Arizona’s Definition of Intellectual Functioning is Unconstitutional
While surveying other states’ approach to assessing the intellectual functioning prong of intellectual disability, the Hall Court questioned the constitutionality of Arizona’s method for determining IQ scores under Atkins but did not purport to decide the issue. Id. at 1996-97. The version of Arizona’s statute in place at the time of Smith’s evidentiary hearing, like the current version of the statute, includes a hard IQ cut-off score of 70, and precludes a defendant from presenting additional evidence of intellectual disability if all of his or her IQ test scores are above 70. Ariz.Rev.Stat. Ann. § 13-708.02(F) (2006); Ariz.Rev.Stat. Ann. § 13-753(F) (2015). However, Arizona’s statute also instructs courts to “take into account the margin of error for the test administered.” Ariz.Rev.Stat. Ann. § 13-703.02(K)(5) (2006); Ariz.Rev.Stat. Ann. § 13-753(K)(5) (2015). Thus, like Florida’s statute, Arizona’s statute appears constitutional on its face. However, as in Hall, Arizona’s highest court has given the statute an unconstitutional construction. In State v. Roque, 213 Ariz. 193, 141 P.3d 368, 402-03 (2006) (en banc), the Arizona Supreme Court rejected the defendant’s contention that his test score be considered in light of the test’s margin of error, explaining that “the [intellectual disability] statute accounts for margin of error by requiring multiple tests.” This approach to accounting for the margin of error — using multiple tests without taking into consideration the margin of error for each test administered — is expressly foreclosed by Hall. Rather, under Hall, a state must apply the margin of error — meaning the range of scores likely to represent the subject’s actual IQ — to every test administered. See Hall, 134 S.Ct. at 1995-96 (“Even when a person has taken multiple tests, each separate score must be assessed using the SEM.... [Because the test itself may be flawed, or administered in a consistently flawed manner, multiple examinations may result in repeated similar scores, so that even a consistent score is not conclusive evidence of intellectual functioning.”). Thus, as in Hall, the state’s highest court has interpreted a facially constitutional statute to unconstitutionally exclude application of the SEM to each individual IQ test administered. Because Arizona’s Supreme Court construes the statutory requirement to consider a test’s margin of error in a manner directly contrary to that required by Hall, it renders unconstitutional the IQ provision of Arizona’s statute — the intellectual functioning prong of intellectual disability.
2. Arizona’s Definition of Adaptive Behavior is Unconstitutional
Although Hall did not address the second requirement for intellectual disabili *1206 ty — limitations in adaptive behavior — its reasoning applies to this clinical element with equal force. Where states fail to abide by the clinical definition of “adaptive behavior” set forth in Atkins and adopted by a national consensus of states, they violate the Eighth Amendment just as they do in the case of intellectual functioning because they permit the execution of individuals whom Atkins deems ineligible for capital punishment. Hall, 134 S.Ct. at 2001. In short, under Hall, if a state defines adaptive behavior more narrowly than the clinical definition, and if the clinical definition has been adopted by a national consensus of states, that prong likewise runs afoul of the Eighth Amendment. Such is the case with Arizona’s statutory definition of “adaptive behavior,” as construed by its Supreme Court. The only difference is that here the constitutional violation is even clearer.
a. A National Consensus Exists With Regard to the Clinical Definition
As in Hall, to determine whether a national consensus exists within the context of the Eighth Amendment, courts look to “ ‘objective indicia of society’s standards.’ ” Id. at 1996 (quoting Roper v. Simmons, 543 U.S. 551, 563, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005)). To do so, we must consider the number of states that “implement the protections of Atkins by” following the clinical definition of adaptive behavior, id., either expressly by statute or by judicial interpretation, see Roper, 543 U.S. at 564, 125 S.Ct. 1183 (deeming as evidence of a national consensus those states prohibiting the juvenile death penalty “by express provision or judicial interpretation”), including in this figure those states that have abolished the death penalty, see Hall, 134 S.Ct. at 1997. As further evidence of a national consensus, courts also consider the direction and consistency of the change in how states have defined adaptive behavior since Atkins was decided. See id. at 1997-98. If a court determines that such a consensus exists, it proceeds to the next step and determines whether, in its independent judgment, a state’s definition of adaptive behavior is constitutional or unconstitutional. Id. at 2000.
There exists a clear national consensus in favor of using the clinical definition of adaptive behavior. Only four states including Arizona define “adaptive behavior” in non-clinical terms.[4] A fifth appears to require no showing of impaired adaptive behavior at all, and in nine states the definition of adaptive behavior is unclear. Because nothing in the nine states’ statutes or case law suggests that courts in those states define adaptive behavior in non-clinical terms, the result is that only five, or at the very most fourteen, states can be said to permit the use of a nonclinical definition to analyze adaptive behavior under Atkins.
In contrast, thirty-six states prohibit use of a non-clinical definition of adaptive behavior in determining whether an individual is intellectually disabled under Atkins. These include the nineteen states that have abolished the death penalty, and one that has suspended its use. See id. at 1997 (counting among the national consensus those states that have abolished the death penalty, and one that has suspended its use). In addition, sixteen states expressly require use of the clinical definition, either by statute or by interpretation of the courts. See Roper, 543 U.S. at 564, 125 S.Ct. 1183. The thirty-six states prohibiting use of a non-clinical definition of *1207 adaptive behavior far exceed the number of states the Supreme Court has required to establish a national consensus. See Atkins, 536 U.S. at 313-15,122 S.Ct. 2242 (30 states prohibit the death penalty for the intellectually disabled); Roper, 543 U.S. at 564,125 S.Ct. 1183 (30 states prohibit juvenile execution).
As in Hall, it is not simply the aggregate numbers that determine the existence of a national consensus but also the “[c]on-sistency of the direction of the change.” 134 S.Ct. at 1997-98 (comparing the number of states that since Atkins have passed legislation setting a strict IQ score cutoff at 70 with the number of states to either abolish the death penalty or pass legislation allowing defendants to present additional evidence of intellectual disability when their IQ test score is above 70 but within the margin of error). Since Atkins was decided, only one state has passed legislation defining adaptive behavior in non-clinieal terms. During the same period, six states abolished the death penalty legislatively, a court invalidated the death penalty in a seventh, and six other states passed legislation mandating use of the clinical definition, either as expressly stated in the state’s statute or as interpreted by the courts. Since Atkins, “no state that previously [defined adaptive behavior in clinical terms] has modified its law” to mandate a non-clinical definition. Id. at 1998.
Having determined that a national consensus of states forbids use of a non-clinical definition, as indicated by the number of states taking this approach and the consistency of the direction of change, the final step in a court’s inquiry is to apply its own independent judgment to the constitutionality of Arizona’s definition of adaptive behavior. See id. at 1999-2000.
b. Arizona’s Definition is Narrower than the Clinical Definition
The two clinical definitions cited in Atkins and endorsed by a national consensus — the ninth edition of the AAMR and the DSM-IV — define impaired adaptive behavior as the existence of deficits in two or more skill areas among a list of ten or eleven total such areas.[5] Atkins, 536 U.S. at 309 n. 3, 122 S.Ct. 2242. These deficits in themselves have been clinically deemed sufficient to show the impairment of adaptive skills generally. Other measures may, from a clinical standpoint, be under or over-inclusive, but in any event they fail to meet the clinically recognized requirements of Atkins and Hall. Courts generally reach the adaptive behavior prong only in the case of individuals who demonstrate an IQ of 70 or below, a score limited to about 2.3% of the population. AAMR 9th ed., supra, at 37. When the individuals who meet the intellectual functioning prong are evaluated for impairment of adaptive skills under the Atkins clinical standards, only about 1% of the general population actually satisfies that standard and thus meets the clinical definition of intellectual disability. Am. Psychiatric Ass’n, Diagnostic and Statistical Manual of Mental Disorders 38 (5th ed.2013) [hereinafter DSM-Vj. In short, it is this *1208 1% who are deemed to be intellectually disabled and thus under the constitution ineligible for the death penalty.
Arizona’s means of determining impairment of adaptive behavior differs from the nationally agreed upon clinical definition even more substantially than does its IQ provision. Unlike the nationally approved clinical means of determining impaired adaptive behavior, which requires limitations in only a minority of established skill areas, Arizona assesses such limitations generally by examining on an overall basis “the effectiveness or degree to which the defendant meets the standards of personal independence and social responsibility expected of the defendant’s age and cultural group.” Ariz.Rev.Stat. Ann. § 13-703.02(K)(1) (2006); Ariz.Rev.Stat. Ann. § 13-753(K)(1) (2015).
Arizona courts interpret the state’s statutory provision in a manner that is entirely different than that required by Atkins and Hall. See State v. Grell, 212 Ariz. 516, 135 P.3d 696, 709 (2006); accord State v. Boyston, 231 Ariz. 539, 298 P.3d 887, 895 (2013). In Grell, the defendant asserted that he had satisfied the adaptive behavior prong of Arizona’s statute by demonstrating deficits in two of the eleven areas listed in the DSM-IV. Grell, 135 P.3d at 709. Rejecting Grell’s claim that compliance with the DSM-IV, which Hall makes clear is the constitutionally required standard, satisfies the Arizona statute, the Arizona Supreme Court held that
The defense claims to have clearly shown that Grell has deficits in two of the eleven areas listed in the DSM-IV and therefore has mental retardation. The DSM-IV definition of mental retardation, however, while similar in overall meaning, is not the same as the [Arizona] statutory definition. The statute requires an overall assessment of the defendant’s ability to meet society’s expectations of him. It does not require a finding of mental retardation based solely on proof of specific deficits or deficits in only two areas.
135 P.3d at 709 (citation omitted) (emphasis added). Construing the Arizona statute, the Grell Court then found that the defendant had failed to demonstrate a significant impairment in adaptive behavior. Id.
Thus, as construed by the Arizona courts, Arizona’s means of determining impairment of adaptive behavior is not simply different than the clinical means required by Hall: it specifically rejects the Supreme Court’s clinically based substantive standard; it is substantially more restrictive than the constitutionally required standard; and, it fails to cover numerous individuals deemed to be suffering from impaired adaptive behavior under the Constitution. Williams, 303 P.3d at 548 (Eck-erstrom, P.J., dissenting) (“Arizona’s [adaptive behavior] statutory requirements substantially narrow the class of persons who are defined as mentally retarded when compared with the class of those who would be clinically defined as such”). This is because, unlike the nationally approved clinical standard, which requires deficits only in a minimal number of adaptive skill areas, Arizona’s definition, as interpreted by Arizona state courts, requires that impairments be considered globally and determined on an overall basis, regardless of the specific limitations that compel an individual’s classification as adaptively impaired under the constitutionally required clinical standard.
Arizona’s standard departs from the clinical standard in two fundamental ways. First, it requires deficits in both of two general areas: social responsibility and personal independence. By contrast, an individual evaluated under the clinical definition need not manifest deficits in both of these or any other general areas, so long as he demonstrates deficits in at least two *1209 of a number of skill areas. Thus, individuals who demonstrate “significant limitations in ... adaptive behavior” under the AAMR or DSM-IV standards based on factors other than overall social responsibility and personal independence (which are not discreet skill areas under either standard) will fail to satisfy Arizona’s less inclusive standard. The Arizona standard ignores the heterogeneous nature of adaptive behavior and imposes a one-size-fits-all definition that excludes many individuals falling under the clinical definition. See AAMR 9th ed. 13 (“[Tjhere is no one way that defines ‘retarded’ performance. Every person with mental retardation will differ in the nature, extent, and severity of their functional limitations.... The current definition reflects this fact by requiring the presence of limitations in two or more of a variety of adaptive skill areas but does not require any one single limitation or any specific combination of limitations.”).
The second way in which Arizona’s standard diverges from the clinical definition is that it, unlike the clinical definition, includes an “overall assessment of the defendant’s ability to meet society’s expectations of him.” Grell, 135 P.3d at 709. This means that a court may conclude that even an individual demonstrating adaptive deficits in the required areas of personal independence and social responsibility nevertheless does not meet the adaptive behavior prong under the Arizona statute because he has adaptive strengths in certain areas that outweigh adaptive deficits in others. This distinction is critical, because the clinical definition recognizes that adaptive weaknesses may coexist alongside adaptive strengths, and requires that adaptive skills be assessed independently of each other to prevent strengths in certain areas from outweighing weaknesses in others. See AAMR 9th ed. 6 (“Specific adaptive limitations often coexist with strengths in other adaptive skills or other personal capabilities”); id. at 7 (“[A]n individual may have a strength in a particular adaptive skill area (e.g., social skills) while having difficulty in .another skill area (e.g. communication); and ... an individual may possess certain strengths within a particular specific adaptive skill, while at the same time having limitations within the same area (e.g., functional math and functional reading, respectively).”). Because Arizona’s statutory definition of impaired adaptive behavior, as defined by its courts, is under-inclusive and would not cover numerous individuals who would be deemed to suffer from impaired adaptive behavior under the nationally recognized clinical definition, I believe that the Arizona statute, when properly before a federal court, will in all likelihood be held to be unconstitutional.
Although the professional manuals cited in Atkins are no longer the most current versions, the same conclusion is equally likely with respect to the more recent editions. Although Atkins cites the 9th edition of the AAMR and the DSM-IV, see 536 U.S. at 308 n. 3, 122 S.Ct. 2242, Hall cites the DSM-V and the eleventh definition of the American Association of Intellectual and Developmental Disabilities (AAIDD) (formerly the AAMR) (11th ed.2010), see 134 S.Ct. at 1994, 1995, 2000, 2001. Each of the editions cited in Hall retains the essential premise and characteristic of the clinical definition cited in Atkins and rejected by the Arizona Supreme Court: an individual must demonstrate deficits in only a number of skill areas among a larger list, deficits are not required in any specific listed categories, and adaptive deficits in certain categories are sufficient and need not be balanced against or outweighed by strengths in other areas.[6] See Williams, 303 P.3d at 547 *1210 n. 12 (Eekerstrom, P.J., dissenting) (“[T]he revised AAIDD definition [of adaptive behavior] is not a meaningful departure from either the DSM-IV criteria or the AAMR’s prior definitional standard set forth in Atkins.”); Chase v. State, 171 So.3d 463, 471 (Miss.2015) (“The [AAIDD and DSM-V definitions of intellectual disability] have not materially altered the diagnosis of intellectual disability [cited in Atkins ] but have provided new terminology.”); United States v. Williams, 1 F.Supp.3d 1124, 1146-47 (D.Hawaii 2014). Most important, the Arizona Court of Appeals strongly questioned Atkins and expressly rejected the more recent version of the clinical elements, holding that Arizona is not bound by the AAIDD’s clinical guidelines because, under Grell, Arizona’s definition of adaptive behavior differs from the clinical definition. Williams, 303 P.3d at 541.
As the foregoing discussion demonstrates, the Arizona court denied Smith’s Atkins claim by applying a likely unconstitutional statute. An example of how that unconstitutional statute works in practical effect is that with respect to Smith, the Arizona court made no assessment as to whether he met any two of the specific ten or eleven elements listed in Atkins or any of the three domains or elements referred to in Hall but instead relied on the state’s “overall assessment of [his] ability to meet society’s expectations of him” which the Arizona Supreme Court found to be the requirement prescribed in the Arizona statute. This is directly contrary to the substantive clinical standard required by Atkins and Hall. Finally, in this respect, it appears evident that, properly assessed, Smith qualifies as intellectually disabled under both the initial and updated medical standards.
As in this case, the right announced in Atkins may be all that stands between an intellectually disabled defendant and an unconstitutional execution. However, Arizona’s statutory scheme, as interpreted by its courts, severely erodes that right. Given the gravity of this issue and the likelihood that it will arise, in future cases, the Arizona legislature would do well to amend its statutory scheme to bring it within the boundaries of the Eighth Amendment.
Appendix A
I. States that retain the death penalty and define “adaptive behavior” in non-clinical terms.
State Citation
1 Arizona Ariz.Rev.Stat. Ann. § 13 — 753(F); State v. Grell, 135 P.3d 696, 709 (2006).
2 Texas Tex. Health & Safety Code § 591.003(1); Ex parte Briseno, 135 S.W.3d 1, 8-9 (Tex.Crim.App.2004).
3 Utah Utah Code Ann § 77-15a-102.
4 Washington Wash. Rev.Code § 10.95.030(2)(d).
II. States that retain the death penalty but which do not require any showing of impaired adaptive behavior.
set forth in Appendix B.
*1211 State Citation
1Kansas Kan. Stat. Ann. §§ 21-6622(h), 76 — 12b01(i); State v. Maestas, 298 Kan. 765, 783 (Kan.2014).
III. States that retain the death penalty in which the definition of “adaptive behavior” is unclear.
State_Citation_
1 Colorado_Colo.Rev.Stat. Ann. § 18-1.3-1101(2)._
2 Georgia_Ga.Code Ann. § 17-7-131(a)(3)._
3 Indiana Ind.Code § 35-36-9-2; Pruitt v. State, 834 N.E.2d 90,108 (Ind. _2005)._
4 Louisiana_La.Code Crim. Proc. Ann., art. 905.5.1(H)(1)(b)._
5 Montana Montana has no Atkins statute and no cases defining adaptive _behavior._
6 New Hampshire New Hampshire has no Atkins statute and no cases defining _adaptive behavior._
7 South Carolina S.C.Code Ann. § 16 — 3—20(C)(b)(10); Franklin v. Maynard, 588 _S.E.2d 604, 605-06 (2003)._
8 South Dakota SDCL § 23A-27A-26.2._
9 Wyoming_Wyo. Stat. Ann. § 7-ll-301(a)(iii)._
Kansas, New Hampshire, and Wyoming have not carried out any executions in decades.[7] Colorado has carried out only one execution since 1977, and Montana and South Dakota have each carried out three;[8] however, none of these cases appears to have involved a claim raising the Atkins-Hall issue. These states’ definitions thus deserve little weight. See Hall, 134 S.Ct. at 1997; Atkins, 536 U.S. at 316, 122 S.Ct. 2242.
IV. States that have abolished the death penalty.[9]
1. Alaska
2. Connecticut
3. Hawaii
4. Iowa
5. Illinois
6. Massachusetts
7. Maryland
8. Maine
9. Michigan
10. Minnesota
11. Nebraska
12. North Dakota
13. New Jersey
14. New Mexico
15. New York
16. Rhode Island
17. Vermont
*1212 18. Wisconsin
19. West Virginia
In addition, Oregon has suspended its death penalty and has executed only two individuals in the past 40 years. Hall, 184 S.Ct. at 1997. Oregon does not define “adaptive behavior” by statute and Oregon courts have not considered the issue.
y. states that retain the death penalty but utilize the clinical definition of “adaptive behavior.”
State Citation_
1 Alabama Lane v. State, No. CR-10-1343, 2013 WL 5966905, at *5 (Ala.Crim. _App.2013), ___
2 Arkansas_Jackson v. Norris, 615 F.3d 959, 961-62 (8th Cir.2010)._
3 California In re Hawthorne, 35 Cal.4th 40, 47-48 (Cal.2005); Campbell v. _Superior Court, 159 Cal.App.4th 635, 641 (Cal.Ct.App.2008)._
4 Delaware_Del.Code Ann. Tit. 11 § 4209(d)(3)(d)(l)._
5 Florida_Hodges v. State, 55 So.3d 515, 534 (Fla.2010).__
6 Idaho_Idaho Code Ann. § 19-2515A(1)(A).______
7 Kentucky Bowling v. Commonwealth, 163 S.W.3d 361, 369-70 & n. 8 (Ky. _2008)._
8 Missouri_Mo. Ann. Stat. § 565.030(6)._
9 Mississippi Chase v. State, No.2013-CA-01089-SCT, 2015 WL 1848126, at *1-6 _(Miss.2015)._
10 North Carolina N.C. Gen.Stat. Ann. § 15A-2005(a)(l)b._
11 Nevada_Ybarra v. State, 247 P.3d 269, 273-74 & n. 6 (Nev.2011)._
12 Ohio_State v. Lott, 97 Ohio St.3d 303, 305 (Ohio 2002),_
13 Oklahoma_Okla. Stat. Ann, tit. 21 § 701.10b(A)._
14 Pennsylvania_Commonwealth v. Hackett, 99 A.3d 11, 27 (Pa.2014)._
15 Tennessee_State v. Pruitt, 415 S.W.3d 180, 203-04 (Tenn.2013)._
16 Virginia' Va.Code Ann. § 19.2-264.3:1.1(A); Walker v. Kelly, 593 F.3d 319, _323 & n. 2 (4th Cir.2010)._
VI. States that have passed legislation since Atkins defining adaptive behavior in non-clinical terms.
State Citation
1 Utah Utah Code Ann. § 77-15a-102 (West 2003).
VII. States that have abolished the death penalty since Atkins.
State_Citation _
1 Connecticut 2012 Conn. Pub. Acts no. 12-5._
2 Illinois_725 III. Comp. Stat. Ann. 5/119-1 (West 2011),
*1213 3 Maryland Md.Code Ann. Corree. Servs. §§ 3-901 et seq. (Lexis 2008).
4 Nebraska Neb. Laws. L.B. 268 (2015)._
5 New Jersey N.J. Stat. Ann. § 2C:ll-3(b)(l) (West Supp.2007)._
6 New Mexico N.M. Stat. § 31-18-14 (2009)._
The New York Court of Appeals invalidated New York’s death penalty under the State Constitution in 2004. People v. LaValle, 3 N.Y.3d 88, 783 N.Y.S.2d 485, 817 N.E.2d 341 (2004). The legislature has not voted to reinstate it.
VIII. States that have passed legislation since Atkins mandating use of the clinical definition of adaptive behavior.
State_Citation_
1 California Cal.Penal Code Ann. § 1376(a) (West Supp.2003); In re Hawthorne, 35 _Cal.4th 40, 47-48 (Cal.2005)._._
2 Delaware Del.Code Ann, tit. 11 § 4209(d)(3)(d)(l) (2002)._
3 Idaho_Idaho Code Ann. § 19-2515A(1)(A) (2003)._
4 Nevada Nev.Rev.Stat. § 174.098.7 (2003); Ybarra v. State, 247 P.3d 269, 273-74 _(Nev.2011)._
5 Oklahoma Okla. Stat. Ann. § 701.10b(A) (2006)._
6 Virginia Va.Code Ann. § 19.2-264.3:1.1(A) (2003); Walker v. Kelly, 593 F.3d 319, _323 & n. 2 (4th Cir.2010)._
In 2014, Louisiana amended a 2003 statute that had been judicially construed as adopting the clinical definition, and codified a new definition that uses clinical language from the DSM-V but which has not yet been construed by courts. See La. Code Crim. Proc. Ann. Art. 905.5.1(H)(1) (2003) (amended 2009, 2014); State v. Williams, 22 So.3d 867, 880-81 & n. 10 (La.2009); Brumfield v. Cain, 744 F.3d 918, 924 (5th Cir.2014), overruled on other grounds (citing State v. Dunn, 41 So.3d 454, 459 (La.2010)); La.Code Crim. Proc. Ann. Art. 905.5.1(H)(1)(b) (2014).
*1214 Appendix B
[[Image here]]
*1215 [[Image here]]
*1216 [[Image here]]
*1217 1. AAMR9thed., at 1,5.

2. Id.

3. /¿at 5,38.
4. AAMR 10th ed., at 39.
5. Id. at 13,14.
6. Id. at 14,42,198.
7. AAH3D 11th ed., at 221.
i.Id. at43.
9.Id. at217,218,222,224.
10. DSM-IV, at41.
11. Id.
12. Id.
13. Id. at 38.
14. DSM-V, at33.
15. Id. at 33,37,

. Bureau of Justice Statistics, "Prisoners executed under civil authority in the United States, by year, region, and jurisdiction, 1977-2014” (Dec. 10, 2014).

. This figure is current as of July 1, 2015. See Death Penalty Information Center, Death Row Inmates by State, http://www.death penahyinfo.org/death-row-inmates-state-and-size-deathrow-year?scid=9&did= 188# state (last visited Jan. 12, 2016).

. The third element of the Arizona statute requires that the onset of the intellectual functioning and adaptive behavior deficits occur before the age of eighteen. Ariz.Rev.Stat. Ann. § 13-703.02(K)(3) (2006); Ariz.Rev.Stat. Ann. § 13-753(K)(3) (2015). There is no reason to believe that this element is in itself unconstitutional.

. A complete list of states referenced in this section and accompanying authorities is provided in Appendix A.

. The ten adaptive skill areas enumerated in the ninth edition of the AAMR are communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. AAMR 9th ed., supra, at 1, 5, 38. The DSM-IV sets forth a nearly identical list of eleven skill areas, consisting of communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. DSM-IV, supra, at 41. See John H. Blume et ah, Of Atkins and Men: Deviations from Clinical Definitions of Mental Retardation in Death Penalty Cases, 18 Cornell J.L. & Pub. Pol’y 689, 691 (2009)’ (describing the clinical criteria set forth in the AAMR and DSM-IV as "virtually identical”).

. The relevant portions of each professional manual's definition of adaptive behavior are

. Death Penalty Information Center, http:// www.deathpenaltyinfo.org/node/5741 (last visited July 31, 2015).

. Id.

. Death Penalty Information Center, States With and Without the Death Penalty, http:// www.deathpenaltyinfo.org/states-and-without-death-penalty (last visited July 20, 2015).